T.C. Memo. 1996-386


UNITED STATES TAX COURT


STANLEY P. ZURN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 163-93.                    Filed August 20, 1996.


Walter Weiss, for petitioner.

Steven Roth and Mark Weiner, for respondent.


MEMORANDUM OPINION

GERBER, Judge:  Respondent determined deficiencies in and additions to, and a penalty on, petitioner's Federal income tax as follows:

| | | Additions to Tax and Penalty | | | | | |
| Year | Deficiency | Sec. 6651 (a)(1) | Sec. 6653 (b)(1) | Sec. 6653 (b)(2) | Sec. 6653 (b)(1)(A) | Sec. 6653 (b)(1)(B) | Sec. 6661 | Sec. 6663 (a) |
|------|-----------|----------|----------|----------|-------------|-------------|--------|----------|
| 1985 | $34,812 | --- | $23,770 | [1] --- | --- | --- | $8,703 | --- |
| 1986 | 247,288 | --- | --- | --- | $192,009 | [1] | 61,812 | --- |
| 1987 | 46,021 | --- | --- | --- | 42,339 | [1] | 11,505 | --- |

| 1988 | 121,986 | --- | 92,640 | --- | --- | --- | 30,497 | --- |
| 1989 | 110,248 | $27,562 | --- | --- | --- | --- | --- | $82,686 |

[1] 50 percent of the interest due on the portion of the underpayment due to fraud.

Respondent determined the following additions to tax and penalty in the alternative:

| | | Additions to Tax and Penalty | | | | | |
| Year | Deficiency | Sec. 6651 (a)(1) | Sec. 6653 (a)(1) | Sec. 6653 (a)(2) | Sec. 6653 (a)(1)(A) | Sec. 6653 (a)(1)(B) | Sec. 6662 |
| 1985 | $34,812 | $3,885 | $2,377 | [1] | --- | --- | --- |
| 1986 | 247,288 | 61,822 | --- | --- | $12,801 | [1] | --- |
| 1987 | 46,021 | --- | --- | --- | 2,823 | [1] | --- |
| 1988 | 121,986 | --- | 6,176 | --- | --- | --- | --- |
| 1989 | 110,248 | --- | --- | --- | --- | --- | $22,050 |

[1] 50 percent of the interest due on the deficiency.

After concessions, the issues remaining for our consideration are: (1) Whether petitioner failed to include $208,994 in income for 1986; (2) whether petitioner is entitled to a capital or ordinary loss in connection with funds advanced to a business enterprise and, if so, in which year; (3) whether petitioner is entitled to losses claimed in connection with leasing transactions; (4) whether petitioner overstated his alimony deduction by $11,988 for each of the 1985 through 1989 taxable years; (5) whether petitioner is entitled to claim a loss from real estate activity and, if so, the character of such a loss; (6) whether petitioner is liable for an addition to tax for fraud or, alternatively, an addition to tax for negligence and/or delinquency for any of the 1985 through 1988 taxable years; (7) whether petitioner is liable for an addition to tax for substantially understating his income tax for any of the 1985 through 1988 taxable years; (8) whether petitioner is liable for

a fraud penalty or, alternatively, an accuracy-related penalty for 1989; and (9) whether petitioner is liable for an addition to tax for failure to timely file his 1989 Federal income tax return.

Background[1]

For convenience, findings of fact and legal discussion are being combined for related issues. Petitioner resided in Los Angeles, California, at the time the petition in this case was filed. Petitioner, a high school graduate, completed some college on a part-time basis. Petitioner was employed by the City of Los Angeles, Bureau of Street Maintenance, as a construction crew supervisor. The job involved the use of heavy, off-road paving and concrete equipment. Petitioner retired from his city job in 1980 and entered the real estate business.

Petitioner was successful in the real estate business and had accumulated in excess of 20 rental properties by the close of 1989.

Issue 1.  Whether Petitioner Failed To Include Income of $208,994 for 1986

Respondent determined, for 1986, that petitioner's income should be increased by $325,994 attributable to unexplained bank deposits, as follows:

---

[1] The parties' stipulation of facts and exhibits are incorporated herein by this reference.

| Date    | Account No.     | Amount   |
|---------|-----------------|----------|
| Apr. 14 | 064 641-302538  | $60,588  |
| Apr. 16 | 064 641-302538  | 57,000   |
| Apr. 17 | 131-403443-8    | 208,406  |
| Total   |                 | 325,994  |

With respect to the $60,588 amount, respondent conceded before trial that $60,000 was not to be included in income, leaving $588 in controversy. Concerning the $57,000 item, respondent conceded, on brief, that the record reflected that it is not includable in income for 1986. The $208,406 item remains in controversy.

Lowell Thomas Nelson (Mr. Nelson) was involved in the business of buying and selling real estate investment property. He met petitioner in the early 1980's in connection with petitioner's dealings in real property. Mr. Nelson was given power of attorney by petitioner with respect to a specific property transaction. It was customary for Mr. Nelson to hold money on behalf of petitioner. Petitioner had established a bank account of which he and Mr. Nelson were cotrustees, which enabled Mr. Nelson to withdraw funds from the account. The account was opened at Mr. Nelson's request due to petitioner's informal manner of conducting business and because petitioner sent Mr. Nelson relatively small sums of money for various purposes which had accumulated and collectively became a substantial amount.

During the period 1982 through 1987, petitioner and Mr. Nelson were involved in four or five transactions together. On

occasion, petitioner would accompany Mr. Nelson to a real property closing, and petitioner would produce large cashier's checks, which, on occasion, were quite old.  These checks were sometimes from other real property closings, and, in one instance, Mr. Nelson observed a check approximating $59,000.  Due to Mr. Nelson's accumulation of petitioner's funds, on April 18, 1985, Mr. Nelson executed a $115,321.16 promissory note in favor of petitioner.  The $115,321.16 amount represented the balance due to petitioner at that time.  In addition to the amount represented by the promissory note, Mr. Nelson, at various times, held an additional $120,000 to $130,000 of petitioner's money.

On April 17, 1986, petitioner caused $211,433.80 to be transferred "by wire" from the cotrustee account with Mr. Nelson to petitioner's sole account.  Of the $211,433.80, $3,027 represented interest, which petitioner has conceded should have been reported as income for 1986.

Petitioner bears the burden of showing that the unexplained deposits remaining in controversy were not includable in his 1986 income, as determined by respondent.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Bank deposits have been held to be prima facie evidence of income.  Tokarski v. Commissioner, 87 T.C. 74 (1986); Estate of Mason v. Commissioner, 64 T.C. 651 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

Petitioner has provided evidence specifically showing the origin of the $57,000 amount, and respondent conceded this amount on brief. Respondent also conceded $60,000 of the $60,588 deposit, leaving the remaining $588 unexplained and in dispute. The $208,406 deposit also remains in dispute and unexplained. The record reflects that petitioner was involved in numerous real property transactions, including several with Mr. Nelson. Through Mr. Nelson's testimony, petitioner has also shown that, at one time or another, over a 5- or 6-year period, Mr. Nelson held in excess of $200,000 of petitioner's funds. Mr. Nelson also testified that he returned $115,000 to petitioner in 1987 and accounted for several amounts for specific transactions. Petitioner, however, has failed to account for his real estate transactions, some of the proceeds of which respondent has determined were unreported. Petitioner admits that his approach to these transactions was informal and that only limited records are available. His inability to carry his burden is of his own making.

Without petitioner's identification of the source of the $208,406 or $588, we are unable to find that those amounts were not taxable income. Accordingly, we hold that the unexplained deposits totaling $208,994 constitute income to petitioner, which he failed to report for the 1986 taxable year.

Issue 2.  Whether Petitioner Is Entitled to a Capital or Ordinary Loss in Connection With Road Construction Activity, and, If So, in Which Year

In 1980, Gloria Jackson (Ms. Jackson) formed a partnership entitled BAJAC Construction Co. (BAJAC) with her sister, Joanne, and a third partner, Robert O. Hollar (Mr. Hollar).  Due to inadequate cash-flow, BAJAC filed for protection under chapter 11 of the U.S. Bankruptcy Code during 1984.

Cities Development Group, Inc. (Cities), was a corporation formed in the summer of 1985 by Ms. Jackson (80 percent) and Mr. Hollar (20 percent) to engage in subcontracting work and to create a more competitive, nonunion organization.  Cities, which later changed its name to American Cities, was a "minority business enterprise" and a "woman business enterprise", which enabled it to take advantage of certain affirmative action contracting programs.  Cities made a bid on the Lake Elsinore project and was awarded a subcontractor project by Cornish Construction.

Normally, receipt of payment to Cities for road construction work was delayed.  In some instances Cities received payment more than 2 months after the prime contractor had billed the local government.  After completing a percentage of the Lake Elsinore project during the first half of 1986, Cities was removed from the job and commenced litigation in Federal court.  Ms. Jackson believed Lake Elsinore was a project worth $900,000 and sought

about $600,000 in the lawsuit because about 60 percent of the work had been finished. The prime contractor contended that the total Lake Elsinore project was worth no more than $380,000. Consequently, and as a result of the litigation, Cities was experiencing financial problems. As a result, Ms. Jackson began searching for additional financing to supplement Cities' working capital.

In mid-1986, Cities had applied for a bank loan, and, while the application was under consideration, Cities was awarded the MCM Century Freeway project (Century project). Because Cities was required to present insurance certificates as a prerequisite to working on the Century project, Ms. Jackson was under substantial pressure to obtain financing. During August 1986, petitioner met with Ms. Jackson to discuss Cities' financial situation. Ms. Jackson was interested in securing assistance with Cities' financial needs, believing that the Century project would make Cities viable. Petitioner was advised of the pending Federal court litigation, and, as of mid-1986, it appeared that Cities would prevail in that proceeding. Petitioner paid $40,000 for the insurance so that Cities' insurance certificates could be obtained as a prerequisite to bidding on the Century project.

Ms. Jackson was not well acquainted with petitioner, and she insisted that the business arrangement be reduced to writing. Although petitioner advanced relatively large sums of money, he

was generally unconcerned with formalities and sought to do business without the aid of lawyers. Ms. Jackson's father had substantial experience in road construction, including paving, grading, and related matters. Cities was used to obtain minority and women's set-aside contracts. Ms. Jackson, her father, and petitioner joined together to perform on the contracts obtained through Cities. Ms. Jackson was the operating officer, her father was in charge of construction, and petitioner was responsible for providing funding. Although petitioner was not involved in the daily operations of Cities and its activities, he was involved in the decision-making process and advanced money on numerous occasions during 1986 and 1987.

As of June 6, 1986, petitioner had advanced $12,000. Ms. Jackson drafted a promissory note that she believed petitioner could enforce. By July 15, 1986, petitioner had advanced $167,500, which Ms. Jackson memorialized in what she believed to be a valid, enforceable promissory note.

On July 15, 1986, petitioner and Ms. Jackson executed a lease-purchase agreement for certain heavy equipment, including: Trucks, a backhoe and excavator, an air compressor, and other equipment. The machinery was for use by Cities in the Century project. The terms of the lease provided for 6 monthly installments of $16,250, with the first payment to petitioner to begin at the commencement of the progress payments to Cities on

the Century project. After the six payments were made, title of the equipment would pass to Cities. Ms. Jackson, who had attended 1 year of law school, drafted the lease agreement for the leasing transaction with petitioner. Petitioner remained responsible for the maintenance of the equipment. Petitioner paid Cities' $40,000 insurance premium to cover the heavy equipment used in the Century project. A one-paragraph August 1, 1986, document entitled "AGREEMENT" recites that "Cities agrees to pay Stan Zurn 50% of its net profits on the MCM project as compensation and fees for acting as a joint venturer by advancing funds for construction and equipment purchases related to the MCM/Cities project."

On September 30, 1986, Ms. Jackson prepared an agreement acknowledging receipt of $90,000 from, and a promise to repay $100,000 to, petitioner. At this time, Cities expected to obtain approval for a line of credit. Accordingly, Ms. Jackson executed an "Assignment of the Progress Payments" to document petitioner's right to the payments if he chose to enforce his claim.

The Century project began in September 1986. In a September 30, 1986, letter, Ms. Jackson, as president of Cities, assigned all MCM progress payments to petitioner. On October 17, 1986, Ms. Jackson executed an agreement for the benefit of petitioner. The agreement, which referred to petitioner as a "silent joint venture partner", provided that Ms. Jackson promised to reimburse

petitioner for all funds advanced in connection with the Century project.  Petitioner, who was not a shareholder of Cities, refused the offer of what he believed was worthless preferred stock in Cities.  The agreement also provided that payment would be made from the credit line at the time it would be approved by a finance company, and it stated that it was anticipated that the $375,000 credit line application would "be cleared on or before November 20, 1986."  Ultimately, a credit line was not approved.

Throughout the period under consideration, Cities experienced financial difficulties.  Ultimately, petitioner advanced a total of $677,652.  Cities was removed from the Century project and, thus, the road construction equipment had to be stored.  Jim Francis, who maintained a storage facility in Bakersfield, California, stored the equipment.  The storage fees, however, became past due, and, ultimately, the machinery was not recovered from Mr. Francis.

Cities was removed from the Century project before December 31, 1987.  Ms. Jackson, however, into 1989, attempted, without success, to revitalize Cities without petitioner's assistance, financial or otherwise.  During 1988, Ms. Jackson spent most of her time attempting to collect from local governments for work performed.  On December 20, 1988, Ms. Jackson advised petitioner, by letter, of the events surrounding her attempts to continue and/or improve Cities' business.

Cities' image, viewed from the perspective of Ms. Jackson's letter, was flat and without potential. Ms. Jackson attempted to assure petitioner that she intended to repay him. Repayment, however, would have to come from unidentified sources and/or uninitiated businesses that Ms. Jackson intended to start. One such idea concerned an entity to be entitled "Dancer", in which Ms. Jackson offered petitioner 25,000 shares with a stated or par value of $750,000.

On April 17, 1990, Cities filed for relief under chapter 11 of the U.S. Bankruptcy Code. Petitioner was not listed as a creditor in Cities' bankruptcy petition. However, the proceeding was converted to a liquidating bankruptcy, under chapter 7 of the U.S. Bankruptcy Code. In that connection, on June 26, 1991, Ms. Jackson filed an amended bankruptcy petition listing petitioner as a creditor for $659,000. As of the end of 1988, petitioner believed that his claim against Ms. Jackson or Cities was worthless, and he did not commence any action against them to recover his funds. On petitioner's 1988 return, his accountant reported a long-term capital loss in the amount of $186,280 in connection with funds advanced. Petitioner now claims an ordinary loss for 1986 and 1987 or 1988 with respect to the $677,652.

Discussion

Petitioner claims that the $677,652 he advanced and lost constitutes an ordinary loss that may be deducted for 1986 and 1987 or 1988, the year originally claimed. Petitioner has structured his broad-brush approach into several alternatives requiring our analysis of both the timing and character of the loss.

We first consider petitioner's contention that, in contrast to the manner in which he reported it, the loss should have been reported as an ordinary loss under section 165[2] or a business-related bad debt loss under section 166. Losses under section 165(c) are limited to those incurred in a trade or business, in a transaction entered into for profit, or from some form of casualty. A business loss under section 166 would also require the showing that the debt was created in connection with a trade or business. Petitioner contends that his loss is attributable to a trade or business or profit-motivated transaction. Petitioner also argues, in the alternative, that he abandoned his joint venture interest with Ms. Jackson and his interest in the road construction equipment during 1988. Respondent counters that any loss that petitioner may be entitled to should be characterized as a nonbusiness bad debt under section 166.

---

[2] Section references are to the Internal Revenue Code as amended and in effect for the taxable years under consideration. Rule references are to this Court's Rules of Practice and Procedure.

Here again, petitioner bears the burden of showing that he was in a trade or business or an activity entered into for profit. In order to do that under the circumstances of this case, he would have to show that he was a joint venturer with Ms. Jackson and/or her business enterprises or that he entered into his transaction with Ms. Jackson and/or her entities as part of an activity entered into for profit.

Section 165(c) permits the deduction of losses "incurred in a trade or business", sec. 165(c)(1), or "incurred in any transaction entered into for profit, though not connected with a trade or business", sec. 165(c)(2). Although paragraphs (1) and (2) of section 165(c) both deal with losses, one deals with losses incurred in a trade or business and the other with losses not connected with a trade or business. In that regard, section 165(c)(1) concerns operating losses of a profit-seeking activity, and section 165(c)(2) involves a loss due to a nonbusiness reason, such as abandonment. For a loss to be deductible under either paragraph (1) or (2) of section 165(c), however, the taxpayer must be engaged in a trade or business or involved in a transaction for profit.

Section 166(a)(1) provides for the deduction of any debt that becomes worthless during the taxable year. Section 166(a) does not apply to a nonbusiness debt, which is defined in section 166(d)(2) as any debt other than (A) a debt created in connection

with a trade or business or (B) a debt, "the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

We must therefore decide the nature of petitioner's relationship with Ms. Jackson and/or her corporate entity; i.e., whether he was a joint venturer, creditor, investor, stockholder, etc. Petitioner contends that he was a joint venturer. As a guide to answering this type of question, courts have focused generally on whether the parties intended to and did join together for the accomplishment of a specific enterprise. Commissioner v. Culbertson, 337 U.S. 733 (1949). Some of the factors to be considered are set forth in the following oft-quoted language of Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964):

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

Some of the formal manifestations of a joint venture are absent here due to the need to keep petitioner's involvement in the enterprise undisclosed.  Other than that aspect, petitioner advanced funds for the purpose of making a profit from the government road construction.  Cities was the instrumentality used to obtain preferred treatment for Ms. Jackson's status as a minority and/or woman owner.  Without petitioner's involvement, Cities was a mere shell without funding.  Petitioner brought his government experience and financial capability, and Ms. Jackson brought her entrepreneurial skills, experience, and preferred status to the venture.

The relationship between petitioner and Ms. Jackson (and her corporate business, Cities) came about due to Ms. Jackson's financial difficulties.  Cities, a corporation, was formed to address several needs and interests.  Ms. Jackson was attempting to recover from financial difficulties and labor problems that she had encountered in a prior enterprise.  Significantly, Cities' capital ownership was structured to take advantage of affirmative action contracting policies.  Ms. Jackson owned 80 percent of the voting common stock, which entitled Cities to the preferred status of a "minority business enterprise" and a "woman business enterprise".

Petitioner entered into a joint venture with Ms. Jackson to use Cities to accomplish the venturers' goal of obtaining local

government road construction contracts. Both petitioner and Ms. Jackson's father had substantial experience in road construction. Ms. Jackson kept petitioner's involvement with Cities and its projects confidential. Petitioner's anonymity was likely connected to Cities' ability to maintain its preferred status as a minority or woman owned and operated business enterprise. As a result, the documentation of Ms. Jackson's and petitioner's relationship is somewhat terse. For example, there are notes and some agreements that seem to characterize petitioner as a creditor. One document reflects a loan of $90,000 and provides for the repayment of $100,000. That note reflects interest to petitioner in a discounted form for the use of his money. Overall, notes exist for about one-third of the total amount advanced by petitioner. In addition, no Cities stock was issued in petitioner's name. The few informal documents contain references to petitioner, either as a silent partner or a partner with a 50-percent share of profits from the government construction contracts. Although Cities was the entity to which the road contracts were awarded, in their agreements Ms. Jackson and petitioner treated as their own any profits from such contracts.

As part of petitioner's involvement in the road contracting, petitioner was provided with title to Cities' machinery, and he, in turn, leased the machinery to Cities in exchange for rent

payments. Ms. Jackson used that approach as an inducement for petitioner to advance more funds into their joint venture by providing him with ownership as security and rental income in exchange for additional funding. We note that the machinery was worth about $100,000, the equivalent of about one-sixth of the funds advanced.

The substance of petitioner's involvement with Ms. Jackson and her corporation was to profit from obtaining government road contracts. Respondent's position that petitioner was a passive investor who advanced two-thirds of a million dollars with only limited security and no stock ownership does not ring true. Respondent, concerning whether petitioner should be treated as a creditor, refers to petitioner as a "white knight" who advanced funds to Ms. Jackson and Cities. It is difficult to imagine any reason for petitioner's substantial participation other than his interest in the "pot" of profits at the end of Ms. Jackson's promotional "rainbow" and the rent he was to receive from leasing the machinery.

Early in the relationship, petitioner was to receive 50 percent of the profits from the government road contract. When Cities' involvement in the government contract was canceled and things began to deteriorate, petitioner was promised all of the receipts from the government contracts--which, at that time,

translated into the recovery of payables owed Cities or the judgment from litigation pursued against the prime contractor.

Initially, one of the documents provided that petitioner was to receive a 50-percent profit from the Century project. That is a strong indication that he was in a joint venture with Ms. Jackson. At that point, petitioner had advanced about $167,000. Subsequently, petitioner advanced several hundred thousand dollars in addition to the $167,000, and he was assigned all MCM progress payments by Ms. Jackson.

A case that also was beset by complexity caused by a shortage of formal documentation is Stanchfield v. Commissioner, T.C. Memo. 1965-305. In that case, the taxpayer had advanced money that, ultimately, was used by a corporate entity in which the taxpayer had no ownership. In that case, it was held that the taxpayer was a venturer, and, additionally, he had lent money to the venture.

One hundred thousand dollars of the $677,652 advanced here is easily segregated as being for the machinery leased by petitioner to Cities. The remaining $577,652, however, could be divided between petitioner's capital investment in the joint venture and his advances or loans. It is a paradox that the early advances were evidenced by notes and that the later advances were not. That inconsistency can be attributed to several possibilities, including the need to keep petitioner's

involvement undisclosed and/or petitioner's propensity to enter into undocumented and informal relationships coupled with his aversion to lawyers.

Key to our analysis, however, are the circumstances at the time petitioner began his involvement with Ms. Jackson. Her prior enterprise was in bankruptcy, and litigation in Federal court was pending regarding the prior enterprise's contract. Although a corporate entity had been formed (Cities), it was without funding and needed initial capital to pursue the Century project. Ms. Jackson was in a position to offer her business acumen and the preferred status of Cities, her minority-owned corporation. In this regard, Ms. Jackson's most recent business experiences had been less than successful. Petitioner had government and road construction experience, and most importantly, he was a source of funding. Under these circumstances, we find that petitioner's capital investment in the joint venture was $52,000, consisting of the initial $12,000 payment made in June 1986 and the $40,000 insurance payment. These amounts were prerequisites to obtaining the Century project. The remaining advances are to be treated as loans to the joint venture.

Having decided that petitioner was engaged in a joint venture, and the allocation of the total amount of advances into discrete categories, we next consider the parties' positions

concerning the timing of the loss. Petitioner contends that the losses occurred in the years (1986 and 1987) he advanced money to the joint venture with Ms. Jackson. In the alternative, petitioner argues that he abandoned his interest in the joint venture and/or that it was worthless as of the end of 1988. Respondent argues that petitioner's interest was not abandoned or worthless during 1988 and that the possibility of recoupment remained through 1989 and until 1990, when Ms. Jackson's enterprise was petitioned into bankruptcy.

The parties have agreed that petitioner made payments to Cities during 1986 and 1987 in the amounts of $463,944 and $213,708, respectively. Petitioner's argument that those amounts represent losses for 1986 and 1987 is based on section 165(c)(1). In other words, petitioner contends that the joint venture incurred an operating loss for 1986 and 1987. Petitioner did not offer an accounting of the joint venture's or Cities' income and expenses for the year 1986 or 1987. Accordingly, the record does not support petitioner's entitlement to an operating loss for 1986 or 1987. In addition, even if petitioner had shown a loss for the venture, he was entitled to 50 percent of the profits, and, presumably, he would bear 50 percent of any losses. To be entitled to deduct an abandonment loss under section 165, a taxpayer must show: (1) An intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment.

United States v. White Dental Co., 274 U.S. 398 (1927); A.J. Indus., Inc. v. United States, 503 F.2d 660, 670 (9th Cir. 1974); CRST, Inc. v. Commissioner, 92 T.C. 1249, 1257 (1989), affd. 909 F.2d 1146 (8th Cir. 1990).

In determining a taxpayer's intent to abandon, the "subjective judgment of the taxpayer * * * as to whether the business assets will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer." A.J. Indus., Inc. v. United States, supra at 670. Here petitioner formed an intent to abandon the partnership interest as well as the road equipment sometime after 1987 when the contract was canceled and no payments were forthcoming.

The missing element, however, is an affirmative act of abandonment. An affirmative act to abandon must be ascertained from all the facts and surrounding circumstances, United Cal. Bank v. Commissioner, 41 T.C. 437, 451 (1964), affd. per curiam 340 F.2d 320 (9th Cir. 1965), and "the Tax Court [is] entitled to look beyond the taxpayer's formal characterization", Laport v. Commissioner, 671 F.2d 1028, 1032 (7th Cir. 1982), affg. T.C. Memo. 1980-355. "The mere intention alone to abandon is not, nor is non-use alone, sufficient to accomplish abandonment." Beus v. Commissioner, 261 F.2d 176, 180 (9th Cir. 1958), affg. 28 T.C. 1133 (1957). Petitioner has not shown an affirmative act of

abandonment of his interest in the joint venture or the road construction equipment, and, accordingly, he is not entitled to a deduction for the joint venture interest or undepreciated value of the machinery for the taxable years before the Court.

Concerning the amounts advanced to the joint venture, a debt becomes deductible when it becomes worthless. Denver & R.G.W. R.R. v. Commissioner, 32 T.C. 43 (1959), affd. 279 F.2d 368 (10th Cir. 1960). Petitioner bears the burden of proving when and if a debt is worthless. Rule 142(a); James A. Messer Co. v. Commissioner, 57 T.C. 848 (1972). The question of worthlessness is factual, and the standard has been described in the following manner:

> Debts are wholly worthless when there are reasonable grounds for abandoning any hope of repayment in the future. Dallmeyer v. Commissioner, 14 T.C. 1282, 1292 (1950), and it could thus be concluded that they have lost their "last vestige of value." Bodzy v. Commissioner, 321 F.2d 331, 335 (5th Cir. 1963). This will usually entail proof of the existence of identifiable events which demonstrate the valuelessness of the debts. Riss v. Commissioner, 478 F.2d 1160 (8th Cir. 1973); Crown v. Commissioner, 77 T.C. 582, 598 (1981); Hubble v. Commissioner, 42 T.C.M. 1537, 1544 (1981).

Estate of Mann v. United States, 731 F.2d 267, 276 (5th Cir. 1984).

In mid-1986, petitioner entered into the joint venture with Ms. Jackson and began advancing funds. Ms. Jackson had cash-flow problems. Petitioner agreed to become involved with Ms. Jackson although he was aware of her business history. He advanced

$463,944 and $213,708 during 1986 and 1987, respectively. Petitioner continued along this path late into 1987 when Cities was removed from the Century project. After that point, no funds were advanced by petitioner, and his involvement with Ms. Jackson and Cities ceased.

As of the end of 1988, it was apparent from Ms. Jackson's December 1988 letter to petitioner that Cities and its contracts were dormant and that the only hope depended on the mere possibility that Ms. Jackson could develop and finance another project or business from which petitioner could be paid. As mentioned in the 1988 letter to petitioner, Ms. Jackson was attempting to obtain financing for several promotions she had conceptualized. Considering Ms. Jackson's financial situation and past business performance, it would be pure speculation to expect any possibility of petitioner's being repaid.

During 1988 and 1989, Ms. Jackson and Cities were, for all purposes, without resources and Cities was dormant until the time bankruptcy was declared, first in 1990, to attempt a reorganization, and then in 1991, when it was converted into a liquidating proceeding. The declaration of bankruptcy was foreordained from the time the Century project was canceled late in 1987. Petitioner was listed as a creditor with a claim of $659,000 in the liquidating bankruptcy. Although Ms. Jackson and Cities did not formally declare insolvency or bankruptcy until

1990, petitioner had no hope of recovery as of the end of 1988. In this regard, petitioner's accountant claimed a $186,280 bad debt for 1988. Apparently, petitioner's accountant claimed only the amount evidenced by documentation (notes and agreements), even though petitioner had advanced $677,652 as of the end of 1988.

On this record, we hold there was no hope of repayment of any portion of the $677,652 in payments made by petitioner. Accordingly, petitioner properly claimed a bad debt loss for 1988, but the amount should be increased from the $186,280 claimed to $515,652 ($677,652 less $152,000),[3] and it should be characterized as a loss under section 166(a)--a business bad debt.

Issue 3. Whether Petitioner Is Entitled to Losses Claimed in Connection With the Leasing Transaction

Petitioner claimed an equipment leasing loss on each Schedule C attached to his 1986 through 1989 Federal income tax returns. The amounts in controversy are: 1986--$60,306 ($40,000 insurance payment, $1,000 legal fees, and $19,306 depreciation); 1987--$36,781 ($915 mortgage interest, $5,000 legal fees, and $30,866 depreciation); 1988--$24,845 ($3,516 for insurance, $552 for other expenses, and $20,777 for depreciation); and 1989--

---

[3] The remaining $152,000 represents capital investment and is dealt with in other portions of this opinion.

$20,938 ($161 for mortgage interest and $20,777 for depreciation).

Respondent argues that petitioner is not entitled to the amounts claimed because of his failure to substantiate the amounts and show that the leasing activity was a trade or business and/or a profit-seeking activity. The lease of the road construction and related machinery was integrated with the joint venture and lending activity between petitioner and Ms. Jackson. We have already decided that the overall activity was a trade or business, in the form of a joint venture, and that the leasing activity is covered within our analysis in the preceding issue. Based on our prior findings and analysis, we find that petitioner's leasing activity was a trade or business and/or an activity entered into for profit.

The record here supports petitioner's ownership of $100,000 of equipment that he leased to Cities. Petitioner, however, has not substantiated any of the amounts claimed for legal fees, mortgage interest, or "other expenses" which he claimed on the Schedules C. With respect to the amounts claimed for insurance, the $40,000 amount has been found to be a part of petitioner's capital investment in the joint venture with Ms. Jackson. The other amount claimed for insurance ($3,516) has not been substantiated by petitioner.

In addition, petitioner argued and we have found that as of the end of 1988 Cities was inactive with no hope of being revitalized, and the road construction equipment was not being used for business purposes. Petitioner contended that the debt was worthless and that he had abandoned the road construction equipment. In this regard, although petitioner did not specify when inquiries about the road construction equipment were made, he claims to have abandoned the road construction equipment, ostensibly because it could not be located or because storage and maintenance fees exceeded the value of the equipment. Accordingly, we find that petitioner is entitled to the depreciation claimed through the 1988 taxable year, but no depreciation is allowable for the 1989 taxable year. Petitioner is also entitled to a capital loss with respect to his $52,000 interest in the joint venture as of the end of 1988. Petitioner, however, has not shown his entitlement to an abandonment loss of the leased equipment due to his failure to isolate or specify the time of such abandonment.

Issue 4. Whether Petitioner Overstated His Alimony Deduction by $11,988 in Each Year 1985 Through 1989

Petitioner and his former wife Valery Zurn (Ms. Zurn) were married in 1967 and divorced on August 2, 1978. Petitioner was ordered in the divorce decree to pay Ms. Zurn alimony of $1 per month for 15 years and $50 per month for child support, beginning August 1, 1978. When petitioner originally received the divorce

decree, he did not read it or check it for clerical errors. Therefore, petitioner paid Ms. Zurn $1,000 per month, the amount they each believed to be the correct amount. Petitioner discovered that the divorce decree reflected $1, as opposed to the $1,000 per month, at the time he was being audited by respondent's agent. Thereafter, petitioner and Ms. Zurn stipulated the entry of an order correcting the original decree nunc pro tunc during September 1992. The stipulation and order, which was subscribed by a California Superior Court judge and filed during 1992, amended the original order to reflect monthly payments of $1,000 instead of $1. Petitioner paid Ms. Zurn $1,000 per month during 1985 through 1989.

At the time of the divorce, petitioner and Ms. Zurn jointly owned several rental properties. The titles for those properties remained joint in order to provide Ms. Zurn with security concerning the $1,000 payments to be made over 15 years. In addition, during 1978, petitioner provided Ms. Zurn with a note for an amount in excess of $100,000 as security for the $1,000 payments. After the 15-year period, the properties were to vest in petitioner. As of the time of trial, Ms. Zurn continued to receive $1,000 monthly payments and remained a joint owner in the properties, even though the 15-year period had concluded. The $1,000 payments have been made from income of the jointly held properties, both during and after the 15-year payment period.

Petitioner claimed an alimony deduction of $1,000 per month, or $12,000 for each year at issue. Respondent disallowed $11,988, all but $12 ($1 per month) of the claimed deduction for each of the years in issue.

## Discussion

There is no dispute about the fact that petitioner paid Ms. Zurn $1,000 per month--the only question is whether any amount in excess of $12, on an annual basis, constitutes alimony within the meaning of sections 71 and 215. Petitioner argues that under California law the nunc pro tunc order corrects a mistake in the original order. For Federal income tax purposes, petitioner contends that the correction of a mistake by a State court relates back so as to meet the requirements of sections 71 and 215. Respondent argues that the original decreed amount ($1) was the amount intended by the parties and that no mistake was made. Respondent infers that the $1,000 monthly payment to Ms. Zurn was either to buy out her interest in the property under an implicit property settlement between the parties or income payments attributable to her joint property interests with petitioner.

Section 215 permits a deduction for alimony payments, as defined in section 71. For purposes of this case, payments may qualify as alimony if, in addition to satisfying other requirements, they are received by a spouse under a decree of divorce or of separate maintenance. Sec. 71. In this case, the

original divorce decree was entered in accord with the stipulation of petitioner and Ms. Zurn.  That decree ordered petitioner to pay "$1.00 (one dollar) per month for a period of 15 years (fifteen years)" for Ms. Zurn's support.  It was petitioner's and Ms. Zurn's understanding, however, that the monthly payment was to be $1,000, the amount that was paid each month during the 15-year period.

Prior to the end of the 15-year period and during the audit of petitioner's tax returns that preceded this litigation, petitioner was asked to substantiate the annual $12,000 alimony claim.  It was then that petitioner discovered the divorce decree did not reflect $1,000-per-month alimony payments.  Instead, the decree ordered $1-per-month alimony payments.  Thereafter, petitioner and Ms. Zurn, by means of a stipulation, caused the divorce decree to be modified nunc pro tunc by a State court judge.  The document modifying the original decree states that the nunc pro tunc change from $1 to $1,000 was made to correct a clerical error in the original decree.

This Court has addressed the effect of a nunc pro tunc divorce decree on an earlier decree.  Several cases have given effect, for tax purposes, to the nunc pro tunc change where it corrected a mistake that had been made in the original decree. Johnson v. Commissioner, 45 T.C. 530, 533 (1966).  Johnson distinguished certain earlier cases in which the nunc pro tunc

orders were not given effect for tax purposes. The difference was that the Johnson taxpayer made a showing "that the original decree did not correctly state the divorce court's determination at the time of its entry." Id.

The circumstances here are peculiar in that the original decree was for $1 and Ms. Zurn's retained joint interests in property could provide an explanation for the $1,000 payments as being for some purposes other than spousal support. Further, it is curious that the $1,000 payment continued beyond the 15-year period called for in the divorce decree and that Ms. Zurn retained a joint interest in the real property after the 15-year obligation to pay spousal support had concluded.

These circumstances have given respondent reason to question whether petitioner was entitled to claim the $1,000 payments as alimony. The uncontroverted evidence in this case, however, shows that the original decree was incorrect. The evidence supporting this finding includes the testimony of petitioner and of Ms. Zurn, and the order entered by a California State judge correcting what is referred to as a clerical error in the original decree. Additionally, we note that it may have been to Ms. Zurn's detriment to join in the stipulation correcting the original decree from $1 to $1,000. We use the term "may" because the record here does not indicate whether Ms. Zurn reported income from alimony during the period in question. If the

payments were not alimony and in settlement of her marital estate with petitioner, the payments may not have been taxable to Ms. Zurn. We also note that if the $1,000 payments constituted Ms. Zurn's income in the jointly held property, then petitioner could have reduced the amount of income he reported with respect to those properties.

Petitioner presented credible evidence that respondent did not rebut, other than her theory concerning what we have referred to as peculiar circumstances. Those circumstances are not sufficient to overcome the uncontroverted evidence offered by petitioner. It should be further noted that petitioner's real estate tax information is part of the record in this case and Ms. Zurn's income tax information reflecting how she treated the $1,000 payments, ostensibly, is available to respondent. Even if the information was unavailable, Ms. Zurn testified and could have been questioned at the trial.

Finally, petitioner points out that California courts have held that a nunc pro tunc order will issue only where a mistake of law or fact has been made. Berry v. Berry, 294 P.2d 757 (Cal. App. 2d 1956). This Court is bound by the judgment of the highest court of a State, Commissioner v. Estate of Bosch, 387 U.S. 456 (1967), and we can give credence to judgments of lower State courts. In that regard, we have no reason to doubt that the correction of the original decree in this case was in accord

with California precedent.  Accordingly, petitioner is entitled to $12,000 alimony deduction for each taxable year in issue and the $11,988 disallowance is in error.

Issue 5.  Whether Petitioner Is Entitled To Claim a Loss From a Real Estate Activity, and, If So, the Character of Such a Loss

Petitioner owned several properties in Texas.  B.R. Pritchett (Mr. Pritchett) was the president of Third Aquarius Corp., which was involved in real property management and renovation.  Mr. Pritchett sought funds from petitioner to invest in renovation activity, and petitioner advanced $25,000 and $20,000 during 1982.

In 1985, petitioner asked Mr. Pritchett for the return of some of his investment.  Mr. Pritchett told petitioner that times for the real property business were tough and that many people were losing money.  Petitioner then hired an attorney in Dallas, Texas, and provided the attorney with information relating to Mr. Pritchett's activities.  Ultimately, in 1985 petitioner's attorney commenced a lawsuit against Mr. Pritchett to recover petitioner's money.  A lis pendens was filed with respect to certain of Mr. Pritchett's real property at the time of commencement of the lawsuit.  Petitioner never recovered any amount of the money advanced to Mr. Pritchett.

Petitioner claimed a $35,000 loss for his 1986 taxable year, which respondent disallowed on the grounds that petitioner failed

to show a debtor-creditor relationship and that any such debt became worthless in the taxable year.

Petitioner bears the burden of proving that respondent's determination is in error by showing that he is entitled to a bad debt loss. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933). Although petitioner provided evidence reflecting that funds were advanced to Mr. Pritchett during 1982, there has been no showing that any debts due from Mr. Pritchett or investments in Mr. Pritchett's enterprises became worthless during 1986 or any other year currently before the Court. Accordingly, we hold that petitioner has not shown his entitlement to a $35,000 bad debt loss in connection with Mr. Pritchett for the 1986 taxable year.

<u>Issue 6. Whether Petitioner Is Liable for Additions To Tax for Fraud or, in the Alternative, Additions to Tax for Negligence and Delinquency</u>

Respondent determined an addition to tax for fraud in each of the 5 taxable years before the Court. In addition to the issues on which fact findings have already been made, respondent relies on stipulated matters which were resolved due to petitioner's concessions.

During July 1988, petitioner negotiated the sale of the 3071 Harrington real property (Harrington property) and entered into an escrow agreement with Hanmi Escrow Co. (Hanmi). During August 1988, petitioner negotiated the sale of the 1149 Virgil real property (Virgil property) and entered into an escrow agreement

with Acme Escrow Co. (Acme).  During September 1988, petitioner entered into agreements designed to structure a delay of the exchange of the Harrington and Virgil properties with Fountain Exchange (Fountain).  Fountain was to take title to the Harrington and Virgil properties and act as seller but would hold the sale proceeds until petitioner could find replacement property to make it appear as though a like-kind exchange under section 1031 had occurred within the time allowed by the Internal Revenue Code.  The deferred proceeds of sale were held by Fountain for about 6 months and then paid to Star Global.

Marilyn Russello and her husband owned Acme and Fountain. Their business was to accommodate sellers of property by facilitating what appeared to be a direct exchange in order to give sellers the opportunity to find replacement property and also to claim nonrecognition treatment for any gain from the sale.  This is accomplished by Fountain's acquiring title and receiving the proceeds of sale from the first property being sold.  Fountain holds title for an instant, and then the title is passed to the actual buyer from Fountain's client (true seller). Within 45 days Fountain's client identifies an "up-leg" property, and, within 180 days, closes the second escrow at which Fountain disburses proceeds of the first sale in accord with Fountain's client's instructions.

Using this approach, petitioner deeded the Virgil and Harrington properties to Fountain, which, in turn, deeded the properties to the actual buyers. Petitioner then located a replacement property, and during March 1989 Fountain was instructed by petitioner to transfer the $258,351.54 proceeds from the sale of Virgil and Harrington to Star Global to purchase the "up-leg" property, a 25-percent interest in property known as "Protective Community Land and Oil Corp. Tract, Lot no. 2160" (lot 2160). In some manner the title to the interest in lot 2160 went through a person named Bob Welch (Mr. Welch) to Fountain, which appeared to have exchanged the lot 2160 with petitioner for the Virgil and Harrington properties.

Mr. Welch, a licensed general contractor, had a business relationship with petitioner and acted as his agent for investment purposes. Mr. Welch ran the day-to-day affairs of and owned Star Global, which was involved in imports and exports. Late in 1987, petitioner began investing capital in Star Global, and he continued for a short time, concluding when no profitable deals occurred. After the Star Global import activity was concluded, Mr. Welch and petitioner continued to use the Star Global bank account on which only Mr. Welch was a signatory.

Beginning in 1981, Mr. Welch and Robert Jose Hernandez (Mr. Hernandez) were engaged in a joint real property investment relationship. Initially, Mr. Hernandez had purchased lot 2160

for $500 cash, and later it was acquired by Mr. Welch through some type of exchange with Mr. Hernandez. Lot 2160 consists of about 5 acres of desert land about 100 miles north of Los Angeles. Mr. Welch approached petitioner with the idea of acquiring lot 2160 as the "up-leg" property in the section 1031 exchange.

When Mr. Welch received the $258,351.54 check through Star Global, he converted it into several cashier's checks that were used for the following purposes: (1) Payments to finance a magazine Mr. Welch was working on; (2) payments to Mr. Welch's contracting company; (3) payments to petitioner's new wife; and (4) payments to Mr. Welch's wife. No part of the $258,351.54 was invested on behalf of petitioner.

About 1 month after the closing on the lot 2160 property, petitioner became suspicious about its value, and he came to the conclusion that lot 2160 was worthless. After Mr. Welch was confronted by petitioner, Mr. Welch, during the summer of 1989, gave petitioner one-half of Mr. Welch's one-half interest (a 25-percent interest) in Mr. Welch's magazine, in which approximately $1 million had been invested, mostly by an individual other than Mr. Welch and petitioner. Petitioner continued to associate with Mr. Welch, and about a month or two later, Mr. Welch invested an additional $200,000 of petitioner's newly advanced funds in a different investment.

After Mr. Welch learned during November 1991 that petitioner was being audited by respondent, he attempted to record the quitclaim deed from Mr. Hernandez to himself for the interest in lot 2160. Mr. Welch testified that he realized $165,000 of gain from the sale of lot 2160, but he did not report the transaction on his 1989 Federal tax return. Mr. Welch explained that he did not report the sale of lot 2160 because petitioner's $258,351.54 was ultimately invested in Mr. Welch's magazine.

Petitioner, on his 1989 Federal income tax return, reported a "Tax-Deferred Exchange" under section 1031, reflecting the lot 2160 property with a $305,000 fair market value, as the property received in the exchange. Petitioner reflected a $44,596 basis in lot 2160, and no gain was recognized from the sale of the Virgil and Harrington properties. Petitioner's 1989 return was filed after petitioner became aware that lot 2160 had virtually no value.

Petitioner sold real property at 508 Marsalis during 1984 and reported the sale on the installment basis. For the 1985 through 1989 taxable years, petitioner was entitled to and received interest on the note connected with the 508 Marsalis sale, but he failed to report any of the interest on his 1985 through 1987 income tax returns. Petitioner reported only one-half of the interest received for 1988 and 1989. When confronted by respondent's agent concerning the interest, petitioner told

the agent that he was receiving only one-half of the interest. The agent obtained copies of checks from the buyer of 508 Marsalis which reflected that petitioner was paid the full amount of interest for 1988 and 1989. In several other respects petitioner's responses to respondent's agent were false and/or misleading and shown to be so by third-party investigation by the agent.

Petitioner received and failed to report interest income for 1985, 1986, 1987, 1988, and 1989 in the amounts of $22,822, $33,372, $34,052, $17,321, and $7,712, respectively. Petitioner received and failed to report rental income for 1985, 1986, 1987, 1988, and 1989 in the amounts of $15,693, $19,601, $13,859, $3,046, and $9,703, respectively. Petitioner failed to report income from the sale of real properties for 1985, 1986, 1987, 1988, and 1989 in the amounts of $7,884, $18,792, $4,887, $277,646, and $258,163, respectively. Petitioner was entitled to, although he did not claim, a $179,905 passive loss deduction for 1989 as a result of his $200,000 investment with Welch.

Petitioner did not keep complete or accurate records of his business activity during the years in issue. Petitioner kept no books of original entry, checkbook records, or other organized set of books. For purposes of preparing his Federal income tax returns, petitioner would provide his return preparer, who was a certified public accountant, with receipts and various papers in

shoe boxes. The return preparer required petitioner to make schedules, and, ultimately, the returns prepared for petitioner were based on the unaudited and unverified information presented by petitioner.

Discussion

Respondent determined that petitioner is liable for an addition to tax or penalty for fraud in each of the taxable years in issue. For 1985, section 6653(b)(1) provides for a 50-percent addition to tax if any part of the underpayment is due to fraud, and section 6653(b)(2) provides for an addition equal to 50 percent of the interest payable on the portion of the underpayment attributable to fraud. For 1986 and 1987, section 6653(b)(1)(A) provides for a 75-percent addition to tax on the portion of the underpayment attributable to fraud, and section 6653(b)(1)(B) provides for an addition equal to 50 percent of the interest payable on such portion. Finally, for 1988 and 1989, sections 6653(b)(1) and 6663(a), respectively, provide for a 75-percent addition to tax or penalty on the portion of the underpayment that is attributable to fraud. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Miller v. Commissioner, 94 T.C. 316, 332 (1990).

Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for each of the years in

issue and that some portion of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b).  To meet this burden, respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Stoltzfus v. United States, 398 F.2d 1002 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud is not to be imputed or presumed, but it must be established by some independent evidence of fraudulent intent.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969).  Fraud may not be found under "circumstances which at the most create only suspicion."  Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950); Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). However, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available.  Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra; Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. per curiam

748 F.2d 331 (6th Cir. 1984).  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106.  The intent to conceal or mislead may be inferred from a pattern of conduct.  See Spies v. United States, supra at 499.

Courts have relied on several indicia of fraud in considering the fraud addition in tax cases.  Although no single factor may necessarily be sufficient to establish fraud, the existence of several indicia may be persuasive circumstantial evidence of fraud.  Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Beaver v. Commissioner, supra at 93.

Circumstantial evidence that may give rise to a finding of fraudulent intent includes:  (1) Understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, (6) failure to cooperate with tax authorities, (7) filing false Forms W-4, (8) failure to make estimated tax payments, (9) dealing in cash, (10) engaging in illegal activity, and (11) attempting to conceal illegal activity.  Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; see Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990).  These "badges of fraud" are

nonexclusive.  Miller v. Commissioner, supra at 334.  The taxpayer's background and the context of the events in question may be considered as circumstantial evidence of fraud.  United States v. Murdock, 290 U.S. 389, 395 (1933); Spies v. United States, supra at 497; Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274.

Respondent based a determination of fraud on the following general indicia:  (1) Petitioner's sophistication, (2) his relationship with his return preparer, (3) his propensity to deal in cash, (4) his conduct with respondent's agent, (5) his credibility, (6) the "fraudulent" alimony deduction, and (7) a 5-year pattern of underreported income.

Petitioner admits that he may have made errors in the reporting of his income, but that errors were made for and against his own interests.  Further, petitioner paints himself as an unsophisticated individual who relied on professionals for the preparation of his tax returns.  Although petitioner failed to claim one substantial item which was beneficial to him, the record otherwise reflects a pattern of understatement attributable to unreported income, misrepresentation, and design.

Although petitioner was not specifically educated in accounting and tax matters, he was a successful and effective businessman involved in numerous real estate transactions and complex business transactions.  His mistrust of lawyers and

failure to document his transactions cannot be attributed to inadvertence or mere negligence in the setting of this case. Petitioner made misrepresentations to respondent's agent during the conduct of the audit. He also reported a transaction reflecting nonrecognition of gain from the sale of two parcels of realty which he knew to be incorrect and deceptive. The purported section 1031 item involved a series of steps designed to falsely defer gain on transactions which did not meet the requirements of the statute. In addition, the information supplied to the preparer as reflected in the return was, to petitioner's knowledge, incorrect and misleading.

Petitioner contends that he relied on his return preparer regarding these matters, including the section 1031 exchange. His return preparer, however, simply reported the information provided by petitioner. In that regard petitioner knew that the lot 2160 property was of nominal value and, still, he provided the return preparer with information reflecting that the fair market value of the exchanged property (lot 2160) was $305,000. The amount of value provided was designed to permit the wrongful deferral of several hundred thousand dollars of taxable gain. These are not matters that occurred inadvertently or on a one-time basis. Petitioner also consistently failed to report substantial amounts of income.

Petitioner's failure to keep books was part of his design to hide or obscure his numerous and successful transactions in operating and trading real property. It is also likely that petitioner's anonymous involvement with Ms. Jackson and the road contracts was a deception to permit petitioner to participate in a minority and/or woman's preferential program. Petitioner did suffer a loss in his transactions with Ms. Jackson as well as his transactions with Mr. Welch. The losses incurred in these transactions were funded with income from petitioner's successful real estate activity, some of which was not reported to respondent. Petitioner was knowledgeable about and in control of his real estate activity. Interest income and gains on sales were consistently understated on petitioner's returns for each of the years before the Court.

We accordingly sustain respondent's determination that a part of the understatement for the taxable year 1985 was due to fraud. With respect to the 1986, 1987, 1988, and 1989 taxable years, the unreported income from interest, rent, and the sale of property are due to fraud. For the 1986 taxable year, the unreported income (adjustment "g." on Form 5278 of the notice of deficiency) is also due to fraud. With respect to the 1989 taxable year, the item of increased income attributable to the section 1031 gain is also due to fraud. Because we have found that petitioner is liable for fraud for each of the taxable years

in issue, it is unnecessary to consider whether he is liable for additions to tax for negligence or delinquency for the 1985 through 1988 taxable years.

Regarding the 1989 taxable year, it is unnecessary to consider the accuracy-related penalty under section 6662 because we have found that petitioner is liable under section 6663(a).

With respect to the addition to tax for delinquency under section 6651(a)(1) for the 1989 taxable year, that issue is not preempted by our section 6663(a) finding. Petitioner's 1989 Federal income tax return was not filed until November 29, 1990. Petitioner bears the burden of showing that respondent's determination of the addition to tax for failure to timely file is in error. Petitioner did not show that he obtained extensions to file beyond the normal April 15, 1990, date or that he had reasonable cause for filing beyond the required date. Accordingly, petitioner is liable for the section 6651(a)(1) addition for the 1989 taxable year.

Issue 7. Whether Petitioner Is Liable for the Substantial Understatement Addition to Tax Under Section 6661 for 1985, 1986, 1987, or 1988

Section 6661 provides for a 25-percent addition to tax on any substantial understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). A substantial understatement is one that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1). The amount of an

understatement, for purposes of section 6661, is to be reduced by the portion attributable to any item for which there was substantial authority or any item which was adequately disclosed. Sec. 6661(b)(2)(B).

Petitioner, on brief, made scant reference to section 6661. He argues that he believed that he had no tax liability and/or that he relied on his accountant on the section 1031 transaction, which he believed to be adequately disclosed.  As to petitioner's first position that he believed that he had no tax liability, we have difficulty reconciling that position with the record.

Concerning the possibility of an adequate disclosure, petitioner singles out the section 1031 transaction.  Curiously, respondent did not determine an addition to tax under section 6661 for the 1989 taxable year, the one in which the section 1031 transactions were disclosed.

Accordingly, we find that, for the taxable years 1985 through 1988, petitioner did not show error regarding respondent's determination that section 6661 is applicable, and we sustain the additions to tax under that section for each such year in which the understatement of tax, as recomputed pursuant to our opinion, exceeds the threshold amount of section 6661(b)(1).

To reflect the foregoing and considering concessions of the parties,

Decision will be entered

under Rule 155.